Ms. Kubitschek, am I saying that right? Yes, Your Honor. I think so. We've seen each other before. All right. You have reserved two minutes for rebuttal, and so that gives you eight minutes out of the gate. I just need to make sure my colleagues are ready. Yep. All right. The floor is yours. Thank you.  May it please the Court, my name is Carolyn Kubitschek, and I represent the Stollman family. Room, men. Room, town. Shopping cart. Doghouse. Watch. Seatbelt. Finger. Man. Lunch. They are going. History. Thunder. Man. Finger. But. Many. Tired. Those are the 22 pictures that the Stollman's intellectually disabled, nonverbal daughter pressed on her iPad, which she regarded as a toy.  But what, I mean, Mr. Stollman himself acknowledged he communicated with his daughter through the iPad, didn't he? Not exactly. Mr. Stollman and others have acknowledged that the daughter was able to use her iPad one word at a time for her needs or wants, such as pizza or lunch, but she could not narrate sentences. She could not communicate events that had happened or were going to happen. And she could not put even two words together, let alone three. And that was. Is there some evidence of the fact that certain words that had possible sexual connotations were being used more repeatedly than had been in the past? The word but in particular. The word but. I mean. Yes. There was information that she was using, that she repeatedly pressed the word but but but. But there was also information that she pressed the word pizza many, many, many times. Pizza, pizza, pizza, pizza, pizza. So that unless. I mean, there's nobody says that she used the word but to mean anything. But you have much more to deal with than just what was tapped out on the machine, right? I mean, there was the investigation. There were questions about the relationship between her father and her, the sleeping together, the showering together, the various other things that someone knew coming into it to do the investigation might be alerted to as a problem. Well, Your Honor. I mean, we can't operate by the benefit of hindsight. We have to look at it as it played out over time.  And as it played out over time, the caseworker investigator learned that Mr. Stolman sometimes showered his disabled daughter. Most of the time. And she needed somebody to lay with her to go to sleep. That someone could be the aide who left at 7 p.m. for the diet. It could be her mother or it could be her father. Her body was developing at this stage, right? Yes. Yes. But to say that a woman, a mother who showers her disabled adult son. That was the problem. What? The problem was the father. I'm sorry? The father was the one who was separated from the family. It's not the mother that really is at issue. Well, the father was separated from his wife. And she was separated from him. Yes, this was an extreme separation. There was a, you know, I mean, there's argument both ways. There's arguments that the school may have done some things. Left her unclean and so forth. And that she was unclean when she got to school. And she cried. When she came home, she cried. I don't know whether that was because something had happened at school or something that she was anticipating might happen at home. These were all uncertain questions that ACS had to look at. And then eventually the process was followed, and he was absolved. The father was absolved of all of this. But there was a period of time when there was an investigation going on. You're not claiming that they investigated in bad faith or that they acted in bad faith. That the ACS. We're claiming that the investigators ignored exculpatory evidence and that. . . Well, they made choices. They had exculpatory and inculpatory. Well, what would you say the exculpatory evidence is that the pediatrician didn't think that there was abuse? That the family friend didn't think there was abuse? The family friend was not a family friend. The family friend was a colleague, a work colleague, who knew Mr. Stolman for many years. No, I don't want to denigrate them. I'm just saying that that evidence was just the opinion of other people that there was no abuse taking place, right? But it was an explanation as to why autistic children need to be hugged. And adults also need to feel the pressure. Your Honor, there is a provision in the New York law where an investigator. . . ACS can say we need to investigate more. And it's under Family Court Act Section 1022. And everything pauses for up to a week. That gives them plenty. No, I think I understand that. Look, clearly Mr. Stolman was clear. So ultimately no one is saying that he did abuse the child. Yes. The issue is really whether it was reasonable for ACS to do what it did, acknowledging that ultimately it ends up that these were baseless or unfounded allegations. But I guess we generally are very deferential to ACS in situations like this involving situations of such magnitude, involving potential harms of great seriousness. Well, two things about that. The Court has said before, with regard to the strip search of the child, that the investigators cannot conduct a strip search of a child, examine a child's nude body for investigative purposes unless they have consent or a court order. That law was clearly established. And. . . Why wasn't there consent? We had consent. What? We had consent. I mean, there is consent, and there's a question about what order the assertion of right to do the examination came in. That would help me, since we're on review of summary judgment, if you could identify the three material facts that you claim the district court found against you on and that would require a jury to consider this case, because this is a very fact-heavy case. And we have statutes that require a report when there's reasonable cause to suspect the child's been subject to abuse. And there's a coincidence of some timing about retaliation, but I don't really see material facts that the district court found against you that would negate the reasonable cause that the school and the ACS had to act as they did. So if you could really focus just by identifying two or three facts that you found, you believe the district court found against you on, reasonably, and that a jury could find otherwise, that would help me. Yes. First, that the district court found, as a fact, that the 22 words meant that the child might have been sexually abused and gave reason to call the child abuse hotline. But the defendants knew that the child could not put words together. Therefore, the three words that they, defendants— Judge Walker's been discussing, though, how those words and new words appeared over the course of that week in October. And these are vigilant people who are charged with protecting and taking care of an autistic child when she's at school. And they, you know, the judge found that this was not unreasonable for them to make this determination. And given the deference that Judge Sullivan's referred to, what was unreasonable about that determination by the district judge? Because the three words could not be combined. Man, finger, but, if you don't read them together, then the 22 words have no meaning. But if those appeared unusually in the context of that week and kept appearing repeatedly, as Judge Walker has said, well, isn't that maybe cause for concern? No. No, Your Honor, because the week before, they didn't appear repeatedly during that week. They appeared—the words appeared over time. And she, the girl— So you say it was absolutely meaningless determination? It was absolutely meaningless, and the school knew it. And the defendants have conceded that— But this is all happening at a time when the child is increasingly agitated. She's arriving home from school very, very agitated and crying. And she's in a state of disarray, frequently, as reported by teachers, as to not being properly cleaned or neglected, right? No. No, the teachers had not reported that. The defendant, Fuschetti, the psychologist who called the hotline, claimed that somebody whom she refused to identify had told her that the child was coming to school dirty. But, in fact, the people who knew her best, that is the psychologist, her own psychologist, said no, she wasn't. And most importantly, the school had a communications notebook that they passed back and forth with the girl to her mother. And they assured the mother that if there were any problems with hygiene, they would notify the mother. And the communications notebook says nothing at all about problems with hygiene. When the school closed its inquiry in February 2017, it noted that school officials continue to report concerns that E.S. arrives at school with a soiled diaper and that that was a continuing concern. Should we just overlook that? No. The investigator who said that the parents provided very good care for the child recognized that things happen. A child who is not toilet trained is going to wet or soil her diaper on an hour-long bus ride. And the investigator said that they should make different arrangements so the child wouldn't have to be on the bus for an hour because that's when. . . So you think that the district court was wrong and drew an inference against your clients in looking at the words that were identified by the school. So that was a dispute, a genuine dispute of material fact. Is there anything else you want to. . .  Also, on the issue of the strip search, the district court was wrong in resolving as a fact that the Stolmans consented to the. . . Why was that? Because. . . Don't make that argument. I don't understand it. The Stolmans did not object. That's correct. And the Supreme Court has said that if a person exceeds to apparent authority, that is not consent. And in this particular case, the caseworker said to the Stolmans, I have to see her body. I have to check for marks or bruises. And in the Supreme Court in Calpagass, Texas. . . Well, there was a question. I mean, there was a question. Can I take a look for any marks and bruises, to which Mrs. Stolmans said okay, right? And Mrs. Stolmans says that the question. . . That question came after the caseworker said I have to do it. I have to check her body. I have to look for diaper rash. Can I do it? After she's told them I have to do it, that says to them that they don't have the right to object. And the Supreme Court has said the same thing in the Calp case when the officer said we need to go and talk. And the man said okay, that his okay is not necessarily consent. It is accession to apparent authority. And the issue of consent is a question for the jury, not for the district judge. And is there another inference or genuine disputed material fact that you'd want to call to our attention? Another, yes. When the ACS filed formal charges against Mr. Stolman on Monday, they said falsely, incorrectly and falsely, that he had committed sexual felonies, including anally raping his daughter. There was no information. They had no evidence whatsoever that he had. I'm sorry. Where in the record is that? That is on the petition itself, which they filed in the family court against him. Is that petition in the record that we have here? The petition, no, the petition was an exhibit in the appendix. And it's available in the record. The 56.1 statements include that the statement that they charged him with felony sex abuse and the particular felony was that he had anal sex or oral sex with his disabled daughter. And they quoted, they numbered the statutes. And that was in the ACS report? That was in the petition that was filed to the family court judge in which they used to obtain an order to separate Mr. Stolman from his wife and from his children. Okay, thank you. Can I ask a question about the school defendants? So the claim there is retaliation, it's a retaliation claim, First Amendment retaliation claim, right? One of the claims. The other claim is that the school defendants participated in the prosecution of Mr. Stolman. And they, too. With respect to the retaliation claim, other than the temporal proximity between the complaints by Mrs. Stolman and the report to ACS, what are you relying on to suggest a retaliatory motive? That when the exact same thing had happened a week earlier before the complaints from Mrs. Stolman, that was on October 19th, when the daughter had pressed a series of possibly random icons and possibly strange icons, the school did not report it. Instead, they got… Well, they were in the process of reporting it, though, right? No, they were not. On October 19th, they did not report. Well, no, but the point is they were… I mean, this was a continuing concern that they were… I mean, after and before the complaints from Mrs. Stolman, the school psychologist and others were concerned about this, right? The school psychologist was concerned enough to question the child and to determine whether something had happened, whether she had suddenly learned how to communicate with her iPad. Communicate more than one word, wants and needs. And he determined that she had not, just as every other expert who has examined the child, including the city's own experts, found that she cannot communicate action, she cannot communicate facts, and she cannot communicate two words. Her communication abilities are very, very basic, like those of a 2-year-old. Can she identify a person? What? Can she identify a person? Not with her iPad, no. She can identify a person by pointing. To pizza, yes. Person, no. Correct. So, man, your understanding is when she presses the icon for man, she doesn't know what she's doing. It's not referring to any man. And she refers to, she addresses her own father as Abba, not man. Well, there's no icon for Abba, is there? There was not an icon for Abba, but she's very, very delayed. She doesn't make the connection between man and Abba. All right. Well, we've gone over, but you've reserved some time for rebuttal. Thank you. And now for Ms. McCampbell. Thank you. Am I pronouncing it right? Ms. McCampbell? McCampbell, yes. McCampbell. Okay. Sorry. Good morning, Your Honors. May it please the Court. Amy McCampbell for the defendants. Your Honors, this Court should affirm the grant of summary judgment for the defendants. All the actions that the plaintiffs are challenging, the school defendants' report to the SCR, the State Central Registry, and the ACS defendants' investigation and the family court proceedings, all those were reasonable based on the circumstances, and for that reason, all of the 1983 claims fail. So let me start you with the retaliation claim. Because the temporal proximity is the one that's relied on most. One thing that wasn't relied on, but struck me, is that one of the words that was pressed several times was teacher. And that didn't make it into the report to ACS. That would suggest or could suggest that this was the school officials basically trying to point the finger at the family but divert attention from themselves. I mean, there's a string of letters that includes teacher, excuse me, symbols, one of which included teacher associated with sleep, would, I would have thought, been cause for concern that maybe a teacher was abusing this child. So the full string of words that she pressed on October 27th was included in the written SCR report to the State Central Registry. Sleep, no cover, teacher. I believe, Your Honor, I believe you're referring to a previous string of words in a conversation that she had had back and forth with Dr. O'Connor. It was October 19th with Dr. O'Connor. Yes. So she never says father. I mean, maybe there's no way for her to communicate father, but she does say teacher. But that doesn't make it into the report to ACS. Well, I believe it was in response to a question about who do you sleep with. I have to pull up the exact language. A poor man. A sleep, no cover, teacher. So she said a sleep, no. So that rejected the question about sleeping. And again, the full string of words that she pressed on the 27th was included in the written. I'm talking about the 19th. There were two particular instances. I'm talking about the 19th. Yes. The 19th, we don't have the string of words that she pressed on the 19th in the classroom that prompted the investigation, but then we have the follow-up with Dr. O'Connor, and then on the 27th when it happened again, the full string of words was written down and submitted to the State Central Registry. And here there was ample basis for the school defendants to submit the SDR report. We have Wheelock's testimony that ES started to select words such as man, sleeping, and kiss. Around that time, she started to use the word but in October 2017. She had never selected that on her iPad before. Around the same time, the mother was reporting that she was returning home from school upset. The school staff spoke to the busing staff to see if anything happened on the bus, and they had nothing to report. A lot of the evidence that the plaintiffs are referring to about the limitations on ES's communicative abilities was developed later during the family court proceedings when the plaintiffs hired experts. No, but with respect to a retaliation claim, right, then there has to be some evidence that would support a claim of retaliation. And so the arguments are temporal proximity, the fact that there were strings of words previously that didn't result in an ACS report, and then what I'm saying, which is that there was an omission of the word teacher, even though it came up in the context of words that the school officials did rely on in making a report to ACS. Well, after that back-and-forth with Dr. O'Connor, the school officials did not submit a report at that time because they were not sure if there was really any cause for concern. They monitored the situation, and it was only in October. And this was all that week in October? The first classroom incident was October 19th, and that was when there was the follow-up with Dr. O'Connor where he engaged with her one-on-one on the iPad. Again, the school officials did not submit the SCR report at that time. No, but they were concerned. They were certainly concerned, yes. October 19th at the latest, they're concerned. That's when she's hitting sleeping bag and men, and she's crying and she's exhibiting other signs that would be consistent with emotional trauma. On the 19th, she then says, thick more men, asleep, no cover, teacher. That seems to be concerning, too. And then on the 27th, she has a string of words that include man, finger, butt, which then results in a referral to ACS, right? Yes. Do I have that right? Yes. So I guess that's my question. Does the omission of the word teacher support an inference that this is retaliatory? This is really not an attempt to just alert ACS to possible abuse. It's designed to alert ACS to abuse only by the family, even though there might be equally consistent information about abuse by others. Well, the string of words that was reported included man, finger, butt. So man could be any man. And the investigation is designed to uncover the source. So it wasn't important to let ACS know that she did say something about a teacher? Not every word that she had typed on the iPad was included in the report. The full string of words from the 27th was included, and the report also made clear that that was the type of strings of words, that it wasn't exhaustive of the cause for concern that was brought here. Did teacher appear once or more than once? I don't know without going back in the record. I know there was a follow-up with Dr. O'Connor where she said that at the end of the string of words, where she said asleep, no, and then at the end. And Dr. O'Connor, again. Well, is asleep, no, cover, teacher. So the no is not a teacher or not asleep. I mean, it can be interpreted in any number of ways. But it seems to me asleep, no, cover, teacher is probably more intelligible than room men, room, town, shopping cart, dog house, watch, seat belt, finger man, lunch. Once the report was reported to the SDR, then it gets to ACS, and ACS conducts an investigation, and they follow it up with the family and with the school to discuss ES's behavior. So the question for the retaliation claim is whether the defendants had a basis to report the ES's behavior, which they certainly did, and whether there's a clear showing of retaliatory or punitive intent. And that's the standard from this Court's decision in Cox and subsequent cases. And here there's simply no clear showing. The report was not materially false. Even if one could argue perhaps it could have been more inclusive, it did include the full string of words from the 27th, which is the latest incident that prompted the report. And it noted that this was consistent with her behavior in recent weeks and consistent with other concerns that the school had noticed. Could you address the counsel's argument about the inclusion of an allegation of anal rape in the petition? Sure. So the family court petition includes the potential penal code provisions that the father may have violated, and those accusations are filed upon information and belief. There is no statement in the petition that says the father may have violated. I don't have the document in front of me. Does it just identify the penal code section? Yes, that's right, Your Honor. So it's not a textual allegation of anal rape? No, it does not say that. The allegations that are filed on the sworn statements that are filed, allegations by the caseworker, are the information that was obtained through the investigation. And then, again, upon information and belief, ACS alleges that he may have violated a list of different penal code provisions. This list seems really a very specific reference to a felony violation, and I don't see anything in the record that would support the inclusion of that. It's a list of provisions, again, that he may have violated upon information and belief. But what information or belief would lead to the inclusion of an anal rape charge? Well, there was certainly evidence for ACS to suspect that there may be sexual abuse here. We have the SDR report. We also have the interview, which when ACS arrived at the family's house that Friday night, Mr. Stolman and his daughter, they talked to the caseworker while they were in bed together. And the father was caressing the daughter. The daughter was kissing the father on the neck and face. At the same time, the caseworker learned that the father frequently bathed the daughter, even though the home health aide and the mother could also do that, and the father was out of the house for most of the day, and that he frequently shares a bed with her overnight. So there was certainly basis to suspect that there could be potential sexual abuse in this house. And that was why the investigation was pursued. ACS had probable cause to pursue the investigation. Its actions were all reasonable, and for all these reasons, the plaintiff's various 1983 claims all fail as a matter of law. I could address the body inspection. So in NG, this Court made clear that intrusive examinations, such as x-rays and gynecological exams, require judicial authorization or parental consent, but not all visual examinations necessarily do. And here, this body inspection was not intrusive in the way that an x-ray or a gynecological exam is. This was a search of the body for marks or bruises. The caseworker ---- The government official shows up and says, I have to do this. Wouldn't you feel that you had really no choice but to exceed? So a couple of points, Your Honor. First of all, the totality of the circumstances here, this was a search, a body inspection in the parent's own house, which the caseworker did ask for  The parents removed the clothes away so the caseworker could see the body. This is not at all analogous to the cases that plaintiffs are citing where you have law enforcement. The Knopp case, where there was similar language that plaintiff was quoting, in that case, there were six different officers that woke a teenager up in his bed at 3 a.m. and said, we have to talk. That's very, very different from this incident where you have a caseworker coming in the house and having a conversation with the family. And plaintiff's standard is really ---- that they're suggesting is really seeking to impose a higher standard on child protective investigative workers than is imposed on law enforcement, because as this Court has recognized, law enforcement does not need to show that a suspect knew he could refuse a search in order to demonstrate that a search was lawful. And here, the parents did give consent. The totality of the circumstances shows that it was voluntary consent. And again, this is not the type of intrusive examination that this Court has made clear certainly would necessarily require judicial authorization or parental consent anyway. So for all those reasons, the Fourth Amendment claim was also properly ---- summary judgment was also properly granted to the defendants on that claim. Thank you. Unless Your Honors have any further questions, we would rest on our brief. All right. Thank you. Thank you. We'll now hear from the Chief of the Check for two minutes of rebuttal. Okay. First, as the Court noted, the report did not ---- the report that the school made on October 27th did not mention that the girl had identified a teacher for any reason. And that supports a claim that the report was made in a retaliatory ---- for retaliatory reasons and not because the school, as my opponent says, wanted to get to the bottom of this. Yes. Yes. Yes. Dr. O'Connor himself. Psychologist. The psychologist, yes, who met with her at ---- with the child every day and worked with her and would have ---- she would have thought of him as a teacher. And secondly, the report that the school made on October 27th said that the parents were the people responsible for the mistreatment of the child. It didn't say a teacher might be responsible. It didn't say we don't know who's responsible. It said the parents are responsible. Well, part of what was at issue, of course, was the continued concern about her soiled diaper and her upset and crying and so on. And when ---- it's a leap that a reasonable human being would not make to say that a child who comes home after an hour-long bus ride crying has been ---- that's a sign that her parents have mistreated her. Her parents were concerned that she came home crying after an hour-long bus ride. I mean, an hour-long bus ride could cut kind of both ways. But in any event, I don't want to take your time. Okay. And when the caseworker came by, the caseworker saw that the girl was not crying. She was not afraid of her father. She was not ---- she loved him. Well, that doesn't ---- I mean, it's not a question of being afraid. If you take the worst possible scenario, which is rape, you can have a rape charge based upon the inability of the victim to consent. And, you know, just because she's a minor, you know, that ---- and the relationship could be very good and consensual, but she doesn't have the capacity to consent. Well, there's ---- So all I'm saying is the fact that they're together and sleeping, I'm not saying it supports a rape charge or even a suggestion of that. It could be other kinds of abuse. And don't we want to, just as a general ---- generally as a society, to be sure that the ACS is able to function fully in terms of ---- to determine what cases are serious enough to because of the trauma that occurs when there is a problem. And that's why we tend to favor the ACS and defer to the ACS as a general matter. As a general matter. I'm not saying that you can't make your case, but there's a policy concern. Well, two answers to that. If we want ACS to do its job, and I agree and the Stolmans agree, ACS should be able to do its job, then they either have to provide appropriate training to the investigators, which they didn't, and that is in the record. They did not train ---- Are you saying appropriate training being specific to each case? No. On issues that, as the Supreme Court said, issues that they are likely to face. And the issues that the ACS did not provide training on were issues that they were very ---- their investigators were very likely to face. Number one, sex abuse. There was no training on sex abuse, as the record says. Number two, child abuse involving children who are autistic. And number three, investigating reports involving children who are profoundly developmentally delayed. ACS made a policy decision, unconstitutional policy decision, that instead of training their investigators how to determine whether or not allegations were true or not true ---- But the family court judge basically sort of reaffirmed the separation and continued the investigation, right? The family court judge, right. Once the ---- Well, I mean, it seems to me what you're suggesting is that ACS should have known this wasn't enough, but the family court judge also concluded that this was enough, at least for the time. The family court judge was faced with a sworn statement under oath. But what was false in the statement? That's what I'm saying. This is a situation where you're saying these facts don't support the inferences that ACS was giving them. Correct. But you're not saying they lied or they fabricated information, right? Are you? I'm saying when a government official says that somebody anally raped his daughter, they better have some information. That's a mischaracterization. Your Honor, it is. They were saying that that would be, if there is sexual abuse taking place, that would be a crime associated with sexual abuse of a minor. And if but indicates where the girl is being violated, then that would be anal rape. But I'm asking a different question. Is there anything that you're alleging or have alleged to suggest that the ACS misled the family court judge as to facts? Yes. The facts of anal penetration. So you're saying that ACS said there has been anal penetration by the father. Correct. That's what they said. Tell me where it says that. Okay. Where's the petition? Oh, I'm sorry. Here we go. They said. What are you referring to? This is, I believe it's exhibit five or six. Okay. It says. Are you in the joint appendix? It's not in the. The petition itself is not in the joint appendix. The petition itself was an exhibit which is referred to in the joint appendix. And the joint appendix. The. I'm sorry. The petition itself. The words in the petition are in the joint appendix. The petition says. Esther Stolman. I'm sorry. The father, Samuel Stolman, commits or allows to be committed an offense against the child, ES, as defined in Article 130 of the Penal Law, including, but not limited to, Sections 130-40. But that's just stating what the violations would be if these allegations are founded. But you have to allege facts. You don't allege statutes. You allege facts. So what facts are in the ACS report that are alleged that are misleading? There are no facts. There are no facts that would lead to any type of conclusion of anal rape. Okay. And so.  My point is that the family court judge had no more facts than the ACS did. Right? That's correct. Except the family court judge had the ACS statement under oath, which was not true. And the ACS had no reason to believe it was true. Because they cited a provision that applied to anal rape without rape. Just cited that provision. Citing the provision, and that's frightening. Look, in the context of a criminal case, right, if an agent comes in with a complaint that says, I believe there's probable cause to believe that the defendant committed an armed robbery, that's not enough for the judge to say, Oh, well then I guess there's been an armed robbery, probable cause. No. There has to be facts that are alleged that would support an allegation of that sort. But I don't see anything that would suggest that there was anything other than the observations of Ortiz at the house coupled with the school report about the disturbing icons that were pressed and the emotional state of the child. Am I wrong about that? About one thing, Your Honor. And that is the Supreme Court, since you mentioned the police and law enforcement, the Supreme Court said in the case of Malley v. Briggs some years ago that if a police officer misrepresents in a warrant application, yes, a reasonable jurist could be expected to say, wait a minute, where's the support for this? But in the rush of police work, court work, the jurist might, doesn't always pick up on the fact that the accusation made under oath is not supported by facts. The petition goes on to perhaps a couple pages of specific recounting of observations of the visits and so on. So the fact that it references various sections of the penal law above, as Judge Sullivan is suggesting, to me doesn't amount to an allegation that on X and Y date this occasion, this incident of anal rape occurred. We have reason to suspect, and we are mandatory reporters under the statute, we have reasonable cause to think that abuse is occurring with a broad definition of abuse. And they have to report. That's their statutory obligation. So I question, I have to question your allegation that this shows bad faith and a retaliatory motive and, you know, the other elements that you need to make out your case. Because, number one, they didn't have to say, we think she's being anally raped. Well, they didn't say that exactly, did they? Well, the law, State law requires them to put in the provisions of the penal law, which they say were violated. They said responded father sexually abused the subject child, age 14, in that, and then they proceed with a series of factual allegations. Okay. So I'm looking at. If I'm looking at the right thing. This is a case memory of a petition filed October 30, 2017? Yes. In the addendum. That's what I'm looking at. That's what you're looking at. Okay. And it includes specific sections of the penal law that they say that she violated. They need to have a good faith. There is a provision. And if they were acting honestly, ACS would have gone to court and said, It's Monday morning. We're still investigating. These are the allegations we're investigating. Judge, we need more time to investigate those allegations. Section 1022 of the Family Court Act explicitly gives them the authority to ask for more time, freeze the situation as it is for up to a week, which is plenty of time, to consult with the experts who eventually said the allegations were not true. But they didn't say that. New York law also gives them immunity from liability if they have reported in good faith, and good faith is presumed unless you can show willful misconduct or gross negligence. Isn't that right? State statutory immunity does not carry over to constitutional claims. Excuse me, because this is constitutional. This is a constitutional claim, yes, the wrongful separation of a family. Right. It also does not apply to filing a case in the court. The state immunity. Okay, but the filing resulted from their mandatory reporting capacity. There's a filing. I think we have your argument. Thank you. All right. Thank you. Well, we went over, but it was worth it. I mean, this is an important case and a difficult situation. So thank you. We're going to reserve decision. Thank you, Your Honor. Thank you. Thank you both.